IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| THOMAS MANNING | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 3:20-cv-00150 |
| | ) | |
| WALMART, INC., | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Defendant. | ) | |

_____

**COMPLAINT
AND DEMAND FOR JURY TRIAL**

Plaintiff THOMAS MANNING brings his Complaint against Defendant WALMART, INC., and alleges as follows:

**INTRODUCTION**

1.      Plaintiff Thomas Manning ("Mr. Manning" or "Plaintiff") provided twenty-seven years of exemplary leadership and support for Defendant Walmart, Inc. ("Company" or "Defendant"). He assisted new and existing Sam's Club stores across the county, trained and mentored the Company's future leaders, curated and fostered relationships to improve community engagement, and regularly spoke to prominent individuals and organizations to promote the Company and enhance its reputation. Mr. Manning was the best candidate to take on the challenge of helping a struggling Sam's Club—Club No. 8219 in Matthews, North Carolina—succeed. However, Mr. Manning's efforts as Club Manager of Club No. 8219 were met with little to no support from the Company and as a result, this new role quickly resulted in a steep decline in his mental and physical health. Mr. Manning worked a grueling schedule to make up for a lack of management but the workplace pressures culminated in him having a severe panic attack, losing

1

over sixty pounds in just a few months, and being diagnosed with anxiety, depression, and insomnia.

2.     Mr. Manning was approved for Family and Medical Leave Act ("FMLA") leave, effective November 16, 2018, and had doctor's orders not to communicate with anyone at the Company during his leave in an effort to allow him to recover from workplace stress. On December 6, 2018, only three weeks into his job-protected leave, the Company terminated his employment for a pretextual reason. Ironically, the Company claims Mr. Manning mishandled another employee's FMLA leave but these allegations are baseless. The employee involved expressed to Mr. Manning and multiple other employees her intent to step down from her role following her FMLA leave and Mr. Manning was nothing but supportive during her time with the Company. Following termination of his employment, the Company immediately offered Mr. Manning the opportunity to be rehired after thirty days with "new hire" status, negating the Company's allegations of misconduct, and attempting to deprive Mr. Manning of his FMLA rights.

3.     Mr. Manning brings this action against his former employer, Sam's Club, a subsidiary of Walmart, Inc., stating claims for (i) wrongful discharge in violation of public policy because the Company terminated Mr. Manning because of his actual or perceived disability(ies) (Count I); (ii) Defendant's violation of the Family Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* because the Company interfered with Mr. Manning's right to take FMLA-protected leave (Count II); (iii) Defendant's retaliation against Mr. Manning for requesting and taking FMLA leave by terminating his employment (Count III); and (iv) Defendant's violations of the Americans with Disabilities Act ("ADA") because Defendant refused to grant Mr. Manning a reasonable accommodation and terminated Mr. Manning because of his actual or perceived disabilty(ies) (Count IV).

2

## PARTIES, JURISDICTION, AND VENUE

4.      Defendant, Walmart, Inc., a Delaware corporation, at all times herein was and is the nation's largest private employer with locations throughout United States. Walmart maintains its principal place of business at 702 SW 8th Street, Bentonville, Arkansas 72716. Walmart is registered to do business in North Carolina, with its registered agent, CT Corporation System, located at 160 Mine Lake Ct., Suite 200, Raleigh, North Carolina 27615.

5.      Plaintiff, Thomas Manning, was a resident of Mooresville, North Carolina at all times relevant to this Complaint. Mr. Manning is currently a resident of Manatee County, Florida.

6.       This Court has subject matter jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331 and 1332 *et seq*.

7.       Venue is proper in the United States District Court for the Western District of North Carolina under 28 U.S.C. § 1391, as Mr. Manning worked for Defendant in Matthews, North Carolina and the claims arose in this Judicial District.

## FACTS

8.      Mr. Manning worked for the Company in various roles for over twenty-seven years. He began his career with the Company as an hourly employee in 1992 but the Company realized his leadership potential and awarded him additional responsibility as the years passed.

9.      Mr. Manning was promoted from hourly employment to an Assistant Manager role to gain managerial experience and then began as a General Manager in Illinois in 1999.

10.      When he excelled as a General Manager, he was promoted to Market Membership Sales Manager overseeing the Chicago market and assisting with the Wisconsin area. He remained in this role for twelve years.

11. The Company kept Mr. Manning in the Market Membership Sales Manager role but moved him to North Carolina in 2014, where he supported locations across North Carolina and into Tennessee.

12. In 2016, after proving to be just as successful in North Carolina as he was in Illinois, Mr. Manning was promoted to Senior Territory Manager. In this role, he oversaw four markets across North Carolina, South Carolina, and Tennessee.

13. The Company trusted Mr. Manning's work ethic and consistently gave him additional responsibilities and expanded territories

14. Throughout Mr. Manning's twenty-seven year tenure, he was praised and recognized by Walmart for his performance and dedication to the Company.

15. Mr. Manning received top Associate Engagement Surveys in his managerial roles, was chosen as a mentor for other Club Managers, and was selected as Market Membership Sales Manager of the Quarter multiple times.

16. Mr. Manning frequently served as the face of the Company internally and at community events. The Company trained Mr. Manning for media appearances and he spoke on Walmart and Sam's Club initiatives on television and in newspapers. He also spoke at many events hosted by various organizations and societies to assist the Company in curating and maintaining partnership relationships and joint initiatives in the community.

17. For example, Mr. Manning was a board member and fostered relationships with Chicagoland Autism Connection, coordinated volunteer events for A Safe Haven Foundation, maintained relationships with the Small Business Advocacy Council, and developed a partnership with Illinois Supports All Veterans Equally. He received a legacy award from Jane Addams Hull House and was selected as the local Chicago corporate contact for the National Association of

4

Women Business Owners and Women Impacting Public Policy. Mr. Manning further organized Society for Human Resource Management events and partnered with Walmart executives to develop inner-city growth initiatives which led to the Company's expansion in the city of Chicago.

18.     Mr. Manning was so effective in developing and leveraging partnerships that Walmart's home office leadership requested his assistance with new Sam's Club store openings across the country. He helped create plans to target individuals and companies in the surrounding community to set new stores up for success.

19.     Mr. Manning was further identified as a strategic best practice trainer for new Senior Territory Managers and often lead interview panels. In fact, he was selected to speak with Chief Executive Officer of Sam's Club, Rosalind Brewer, at the corporate home office as an example of leadership excellence in developing the new Senior Territory Sales Manager role.

20.     Mr. Manning's personnel file reflects his outstanding performance over nearly three decades, but the Company has claimed that it "lost" his personnel records when he relocated to North Carolina.

21.     Mr. Manning, by and through his counsel, has requested his personnel records but the Company has failed to provide them.

22.     Despite his upward trajectory in the Company, Mr. Manning made a voluntary decision to step down from his Senior Territory Manager role in 2018, based on family needs which required him to travel less often. At this time, he became the General Manager for Sam's Club No. 8219 in Matthews, North Carolina ("Club No. 8219" or the "Club").

23.     Club No. 8219 was identified as a poorly-performing club and had recently eliminated five of its seven managers due to various performance and ethics issues. However,

Mr. Manning was eager to take on the challenge and believed he would be able to help the Club with the right team and support from the Company.

24. During his ten months with Club No. 8219, the Club was never able to fill all necessary management roles. At times, the Club was understaffed by three managers. All but one of the new managers came from outside companies or were newly promoted into managerial roles and required additional training and experience. Managers brought in from outside companies were unable to be left alone in the Club while they were in training and Mr. Manning had to supervise any hours they worked to ensure things were done properly.

25. Despite Mr. Manning's relentless efforts to improve the staffing of Club No. 8219, the Company provided him with little support and he was unable to prevent manager turnover.

26. Mr. Manning did not want the Club's performance to be negatively impacted by the lack of management, so he began working six to seven days, and 70 to 100 hours, per week, in order to maintain the Club and allow other staff to take time off.

27. Mr. Manning made tremendous sacrifices to try to support the Club's needs, compensate for the lack of management, and develop and mentor staff effectively. However, the months that Mr. Manning spent supporting Club No. 8219 took a significant toll on his mental and physical health.

28. The demanding schedule and constant pressure forced Mr. Manning to seek medical attention for depression, anxiety, high blood pressure, insomnia, and physical exhaustion. Additionally, the stress caused Mr. Manning to lose 60 pounds in just a number of months.

29. Mr. Manning's tremendous weight loss and declining health drew attention from the Company's leadership team, fellow employees, and Club members.

30.     Mr. Manning's visual distress prompted inquiries about his health because the signs of exhaustion were stark.

31.     During the first week of November 2018, former Market Manager, Tangela Griffin, gave Mr. Manning a first-level disciplinary "coaching" following an executive visit during which not all thirty-two endcap features had been set. This executive visit followed a "code white" accident in which a member had a stroke and fell, and Mr. Manning had just finished coordinating the ambulance and cleaning up blood from the member's laceration.

32.     During Mr. Manning's first-level coaching, Ms. Griffin noted his declining health and surprising weight loss but offered no support. Mr. Manning became distressed during the meeting as he had to reiterate the current lack of support due to multiple management openings.

33.     Mr. Manning was unable to provide comments in response to the first-level coaching because he was in an emotional and distressed mental state, which was verbally acknowledged by Ms. Griffin. He was willing to take responsibility for the endcap features not all being set; however, he had not received a coaching in years and the endcap oversight was due to the fact that he did not have enough support, nor the capacity to micromanage every detail in the Club.

34.     At the time of the first-level coaching meeting, Mr. Manning was regularly working at the Club from around 4:00 a.m. until close to ensure expectations were being met and managers were being trained. Mr. Manning apologized to Ms. Griffin for letting the Club down as it was still not performing as expected, but he simply did not have the capacity to further adjust his own hours and needed more managerial support, especially as the holiday season was approaching.

35.     On November 15, 2018, a few days after the "code white" and Mr. Manning's first-level coaching, Mr. Manning had an extreme panic attack near the end of his designated shift due to overwhelming workplace stress.

36.     Mr. Manning was unable to return to work due to his impaired mental and physical state following his panic attack, so he immediately reached out to Ms. Griffin on November 15, 2018 to notify her that he needed to take time off to address his health issues.

37.     Mr. Manning let Ms. Griffin know that he would be unable to work but had made arrangements so the Club's business would not be adversely affected by his absence.

38.     Mr. Manning took paid time off beginning on November 16, 2018 and immediately scheduled medical appointments.

39.     As a result of his panic attack, Mr. Manning reached out to Walmart's Resources for Living and requested support and counseling.

40.     Based on his conversation with Resources for Living, Mr. Manning contacted Sedgwick Claims Management Services ("Sedgwick") and was advised to request a leave of absence.

41.     Mr. Manning applied and was approved for FMLA leave, retroactively effective November 16, 2018 through mid-March 2019.

42.     On November 19, 2018—immediately after Mr. Manning disclosed his health impairments and while he was using paid time off to set up doctor appointments and figure out his medical leave—Ms. Griffin contacted Mr. Manning notifying him that he was needed for an interview.

43.     The interview was about an open ethics ticket related to Ms. Carmela Thompson, the Lead Member Service Supervisor ("Lead MSS"), who had recently taken FMLA leave. Prior to taking her leave, she stated that she would be stepping down from her role upon her return.

44.     The Company has used this ethics ticket as pretext for Mr. Manning's unlawful termination on December 6, 2018, stating that he violated company policy by replacing her role while she was on protected leave.

45.     Mr. Manning's termination letter, dated December 6, 2018, was sent only three weeks after Mr. Manning had a severe panic attack and then informed the Company that he would need to take time off to address his mental and physical health impairments.

46.     Further, Mr. Manning's employment was terminated exactly three weeks from the date that his FMLA leave effectively began, November 16, 2018.

47.     Mr. Manning did not violate company policy in connection with Ms. Thompson's leave. Ms. Thompson explicitly stated intent to step down from her role and provided Mr. Manning with details regarding her medical and family reasons for needing to do so.

48.     Mr. Manning supported Ms. Thompson in her work and when she expressed intent to step down from her role upon returning from leave, he presented her with a number of roles that she could apply for internally if she longer wanted to be the Lead MSS. He recognized her as a strong leader in the Club and wanted to retain her talent.

49.     Prior to Mr. Manning's leave of absence, multiple members of the Club's staff corroborated Mr. Manning's statement that Ms. Thompson formally decided to step down from her Lead MSS position.

50.     Ms. Thompson expressed her intent to step down after her medical leave to Ms. Sarah Winkeljohn, her direct supervisor, as well as other associates at the Club.

51.     On November 1, 2018, Mr. Manning provided Ms. Griffin with written and signed statements by two separate team leaders that Ms. Thompson announced in a team lead meeting that she would be stepping down from the Lead MSS role upon returning from leave.

52.     Further, Nancy Cruz, Member Order Specialist, emailed Mr. Manning confirming that she heard Ms. Thompson telling other leads that she intended to step down from her Lead MSS role. Mr. Manning forwarded the email to Ms. Griffin for her records.

53.     After Ms. Thompson stated that she would be stepping down, Mr. Manning and Ms. Winkeljohn told her that the Club would be actively looking for a replacement Lead MSS so the Club would not face difficulties heading into the holiday season. Ms. Thompson did not raise any concerns with this as she had already made it clear that her family and medical needs would not allow her to move back into the Lead MSS role.

54.     Accordingly, the Club hired Theresa Ensign to take over the Lead MSS role in an "acting" capacity, occupying the position temporarily to ensure continuity during the holiday season.

55.     Ms. Ensign was still the "acting" Lead MSS when Ms. Thompson returned from her leave.

56.     Prior to her return, Ms. Thompson notified Mr. Manning that she may have "changed her mind" about stepping down so Mr. Manning coordinated with other leadership members to determine the best option for moving forward.

57.     At this point, Ms. Griffin told Mr. Manning that written statements from other employees affirming that Ms. Thompson had stated her intent to leave her Lead MSS role would be sufficient to prove Ms. Thompson's intent to step down, and that Mr. Manning had taken proper steps.

58.     Mr. Manning obtained and provided Ms. Griffin with such statements from two team leads on November 1, 2018. Mr. Manning further provided Ms. Griffin with the email from Ms. Cruz on November 2, 2018. See Ex. D, E.

59.     After returning from her leave, Ms. Thompson voluntarily resigned. Mr. Manning asked if she would reconsider given the positive impact she had on the Club, but she declined. The Club sent her off with a goodbye party and a speech by Mr. Manning about how much he appreciated her contributions.

60.     The Company now alleges that Mr. Manning replaced Ms. Thompson while she was on protected leave, warranting termination of his employment. However, Ms. Ensign was never formally offered the Lead MSS position and she was merely acting in the role to assist with the holiday season. Ms. Thompson was notified prior to her leave that the Company would require someone to step into her role during the busy time.

61.     Ms. Ensign was presented as a potential permanent Lead MSS candidate, but only after Ms. Thompson expressed to multiple members of the leadership team that she wanted to step down from the position, and before she notified Mr. Manning that she had "changed her mind."

62.     At the time Mr. Manning went on leave in November 2018, the Lead MSS role had not been permanently filled.

63.     When Ms. Griffin reached out to Mr. Manning about the ethics ticket issue on November 19, 2018, he did not immediately respond because he was taking paid time off to focus on his health following his severe panic attack. Ms. Griffin was aware of his impaired mental state, but she still sent him a second email stating that the interview had been scheduled and he would have to participate despite him taking paid time off.

64. Mr. Manning responded to the second email stating that he had already provided details in response to the open ethics ticket in emails on November 1 and November 2, 2018 and further requested that Ms. Griffin reach out to other employees involved so he could focus on his health. Mr. Manning did not feel that he was in a mental state which would allow him to participate in such an interview and he had already provided all information he had regarding the issue, including sworn statements from two employees corroborating his statements.

65. Ms. Griffin had previously stated that the sworn statements should be sufficient to close the matter and did not express any additional concern regarding the ethics ticket issue until immediately after Mr. Manning disclosed his health impairments and indicated he might need to take a leave of absence.

66. One day later, on November 20, 2018, Mr. Manning's physician and behavioral counselor diagnosed him with Major Depressive Disorder, persistent anxiety with frequent panic attacks, exhaustion, and insomnia. His doctor directed him not to return to work and to refrain from any and all communication with the Company while on leave. Workplace stress was noted as the cause of his increase in blood pressure, weight loss, and decline in mental wellbeing.

67. Mr. Manning contacted Sedgwick immediately to provide his diagnoses. He further requested that they inform the Company of Mr. Manning's doctor's orders not to have any contact with work while he was on medical leave.

68. Following Mr. Manning's diagnoses, the Company determined Mr. Manning was eligible for leave under the FMLA and short-term disability leave. Mr. Manning obtained approved medical leave effective November 16, 2018 through mid-March 2019.

69. After the Company approved Mr. Manning's medical leave, he continued to receive emails, phone calls, and text messages from members of the leadership team demanding responses.

70.     Mr. Manning had to reach out to Sedgwick multiple times to request that they remind members of the leadership team that Mr. Manning had direct doctor orders not to communicate with the Company's employees while he was on leave and under treatment.

71.     On or around December 6, 2018—only three weeks into his leave of absence—Mr. Manning received a letter from the Company stating that his employment was terminated effective December 8, 2018.

72.     Despite his twenty-seven years of service, Mr. Manning was not offered any severance pay or continued benefits.

73.     The Company's stated reason for Mr. Manning's termination was that he violated company policy in connection with Ms. Thompson's leave by replacing her role. As discussed above, Mr. Manning handled the matter appropriately, did what was best for the Club following Ms. Thompson's expressed intent to step down, and provided all relevant information in his possession along with the sworn statements requested by Ms. Griffin. Further, the Lead MSS role was not permanently filled prior to Mr. Manning's FMLA leave.

74.     It was not until immediately after Mr. Manning disclosed his health impairments and began his FMLA leave that his actions related to Ms. Thompson's leave were raised as an issue.

75.     After Mr. Manning learned of his termination, he engaged in a phone call with Ms. Griffin, despite his doctor's orders. During the call, Ms. Griffin referred to Mr. Manning's termination and stated, "if you were there, none of this would have happened." Mr. Manning understood this statement to mean that if he had not been on a leave of absence, he would not have been terminated.

76.     On or around December 18, 2018, despite Mr. Manning's doctor's orders, Mr. Figueroa and Mr. Manning engaged in a phone call to discuss the reasoning for Mr. Manning's termination.

77.     During this call, Mr. Manning requested that the ethics ticket related to Ms. Thompson be re-opened because he had not been given an opportunity to defend the allegations which allegedly warranted his termination.

78.     Despite Mr. Manning's longstanding reputation of integrity and excellent service for over twenty-seven years, Mr. Figueroa denied his request and stated that the ethics investigation resulted in a third-level coaching leading to termination.

79.     Mr. Manning was never interviewed or provided with any coaching related to the matter involving Ms. Thompson, nor was he provided an opportunity to respond to the third-level coaching.

80.     In conjunction with the first-level coaching Mr. Manning received a few days prior due to the lack of management support, the third-level coaching became a fourth-level coaching and allegedly warranted termination of his employment. Since the first-level coaching was also unwarranted and Mr. Manning could not dispute it at the time because he was overwhelmed and emotional, he asked Mr. Figueroa to revisit the first-level coaching as well. Mr. Figueroa denied this request.

81.     During the first-level coaching meeting, Ms. Griffin had explicitly stated that it was apparent Mr. Manning was facing mental and physical impairments due to workplace pressures. The first-level coaching was unwarranted but helped the Company to lay the groundwork for termination of Mr. Manning's employment by administering a similarly baseless third-level coaching.

82. Mr. Manning had not received a coaching in years, and the Company's discriminatory intent is apparent from (1) the temporal proximity of the unwarranted first-level coaching to Ms. Griffin's statements regarding his declining health, and (2) the temporal proximity of the unwarranted third-level coaching to Mr. Manning's medical leave of absence.

83. Despite Mr. Manning's alleged misconduct, Mr. Figueroa indicated that he was re-hirable after thirty days.

84. However, Mr. Figueroa stated that Mr. Manning would be categorized as a "new hire" and would lose his tenure, stock options, vacation time, and all other benefits he earned throughout his time with the Company.

85. The Company retaliated against Mr. Manning for taking FMLA leave by depriving him of benefits he accrued over nearly three decades.

86. Shortly after termination of his employment and his conversation with Mr. Figueroa, Mr. Manning was offered a position as an Assistant Club Manager of the Mooresville Sam's Club by Ms. Griffin.

87. Ms. Griffin asked Mr. Manning to start in the Assistant Manager role beginning on or around February 1, 2018, despite the fact that he had been approved for FMLA leave through mid-March.

88. Aside from the offer being an insulting demotion given Mr. Manning's tenure, he had to decline the offer so he could continue recovering from the physical and mental distress caused by the Company and further exacerbated by the termination of his employment.

89. Instead of allowing Mr. Manning to take his job-protected leave, the Company further interfered with his FMLA leave by terminating his employment and then offering him a demotion that required him to return to work six weeks before his job-protected leave was over.

90.     The unexpected and unwarranted termination of his health insurance, along with his termination, interfered with Mr. Manning's ability to address his physical and mental health concerns. Mr. Manning was forced to contact his doctor and counselor to explain that his insurance had ended and that he would need to cancel his scheduled appointments until he found new insurance. Mr. Manning has a diabetic daughter and the Company's abrupt revocation of benefits has forced him to abandon his treatment and reenter the job market to support his family.

91.     The Company's reasons for terminating Mr. Manning's employment are unsubstantiated and pretextual. Mr. Manning handled employee matters professionally and appropriately. He was never given an opportunity to dispute the allegations against him as the Company knew the grounds for his termination were insufficient.

92.     The fact that Mr. Manning was immediately re-hirable and has already been offered a new position negates the Company's assertion that he committed any misconduct that warranted termination of his employment.

93.     Notably, the Company was notified multiple times of Mr. Manning doctor's orders not to communicate with anyone from the Company during his leave of absence. The Company disregarded this instruction when employees needed Mr. Manning's assistance with work matters but conveniently abided by the directive when it allowed the Company to terminate his employment without providing him an opportunity to refute untrue allegations.

94.     The Company terminated Mr. Manning's employment only three weeks after his approved FMLA leave began, raising an inference that the Company intended to deprive him of his rights under the FMLA and retaliate against him for attempting to exercise such rights.

95.     Mr. Manning was approved for protected leave to recover from the extreme stress of his role. Instead of allowing him to take the leave he was entitled to, the Company stripped him

of benefits accrued over nearly three decades of service, interfered with his FMLA leave, and unexpectedly and wrongfully terminated his employment on the basis of disability.

96.     Mr. Manning also filed a charge of discrimination on the basis of disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*., with the Equal Employment Opportunity Commission ("EEOC").

**COUNT I**
***Wrongful Discharge In Violation of Public Policy***

97.     The allegations in the foregoing paragraphs are incorporated by reference herein.

98.     The public policy of the State of North Carolina, as set forth in N.C.G.S. § 143-422l *et seq.*, North Carolina's Equal Employment Practices Act, and in N.C.G.S. § 168A *et seq.*, North Carolina's Persons with Disabilities Protection Act, prohibits employers from discriminating against employees on the basis of their actual or perceived disability (also referred to as "handicap").

99.     Plaintiff qualified as an individual with a disability in that he was actually disabled and was perceived as such. Mr. Manning's health rapidly deteriorated throughout 2018 and he was eventually diagnosed with depression, anxiety, high blood pressure, insomnia, and physical exhaustion.

100.     Plaintiff's disability(ies) were accompanied by extreme weight loss of approximately 60 pounds over a couple months, he was visibly distressed, and he experienced a panic attack while at work. These outward symptoms drew attention from the Defendant's leadership team, fellow employees, and Club members, and prompted inquiries from said individuals about his health.

101.     Defendant violated North Carolina public policy by terminating Plaintiff because of his disability(ies). Specifically, Defendant terminated Plaintiff because of his real or perceived

17

disability (i) shortly after it became visibly apparent Plaintiff's health was declining, and (ii) approximately three weeks after Plaintiff requested and began utilizing his right to FMLA leave.

102.    This employer conduct has the tendency to be injurious to the public policy of North Carolina and is against the public good.

103.    Defendant's actions actually and proximately caused Plaintiff damages. As a proximate result of Defendant's wrongful conduct, Plaintiff has suffered lost wages, lost benefits, emotional distress, anxiety, humiliation, and damage to his reputation and is entitled to recover compensatory damages.

104.    Defendant's actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights such that Plaintiff is also entitled to recover punitive damages. Defendant's officers, directors, and managers participated in and condoned the malicious, willful, wanton, and reckless conduct alleged above.

## COUNT II
### *Interference with the Family and Medical Leave Act*

105.    The allegations in the foregoing paragraphs are incorporated by reference herein.

106.    At all times relevant, Plaintiff was an eligible "employee" of Defendant as defined by the FMLA. *See* 29 C.F.R. § 825.110.

107.    At all times relevant, Defendant was a covered "employer" as that term is defined by FMLA. *See* 29 C.F.R. § 825.104.

108.    Plaintiff was entitled medical leave pursuant to the FMLA to recover from serious health conditions which rendered him unable to perform the essential functions of his job with Defendant.

109.    Plaintiff's FMLA leave was approved and effective beginning on November 16,

2018. Defendant was aware of Plaintiff's mental and physical health impairments, including his depression, anxiety, physical exhaustion, and extreme weight loss caused by the stress of his role.

110.    Plaintiff informed Defendant that his doctor ordered him to take time off as well as not to communicate with anyone from the Company during his leave. Plaintiff was forced to reiterate his doctor's orders multiple times when Defendant repeatedly contacted Plaintiff requesting that he work while on leave, thereby failing to respect his doctor's orders and interfering with his FMLA rights to be relieved of workplace duties and the accompanying stress while on medical leave.

111.    Defendant further interfered with Plaintiff's FMLA rights by terminating his employment only three weeks into his FMLA leave.

112.    Defendant then offered Plaintiff a demotion beginning six weeks before his approved FMLA leave was scheduled to end in an attempt to thwart him from availing himself of the remainder of his protected leave.

113.    Defendant was also required to maintain the same level of existing coverage under Plaintiff's group health plan during his FMLA leave. However, Defendant further interfered with Plaintiff's rights under the FMLA by terminating his employment and corresponding benefits three weeks into his protected leave.

114.    Defendant's actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights such that Plaintiff is also entitled to recover liquidated damages.

115.    As a direct and proximate result of Defendant's acts, Plaintiff has suffered and continues to suffer damages.

*Retaliation in Violation of the Family and Medical Leave Act*

116.    The allegations in the foregoing paragraphs are incorporated by reference herein.

117.    At all times relevant, Plaintiff was an eligible "employee" of Walmart as defined by the FMLA. *See* 29 C.F.R. § 825.110.

118.    At all times relevant, Defendant was a covered "employer" as that term is defined by FMLA. *See* 29 C.F.R. § 825.104.

119.    Plaintiff was entitled medical leave pursuant to the FMLA to recover from serious health conditions which rendered him unable to perform the essential functions of his job with Defendant.

120.    Plaintiff's FMLA leave was approved and effective beginning on November 16, 2018. Defendant was aware of Plaintiff's mental and physical health impairments, including his depression, anxiety, physical exhaustion, and extreme weight loss caused by the stress of his role.

121.    Plaintiff informed Defendant that his doctor ordered him to take time off as well as not to communicate with anyone from the Company during his leave. Plaintiff was forced to reiterate his doctor's orders multiple times when Defendant repeatedly contacted Plaintiff requesting that he work while on leave, thereby failing to respect his doctor's orders and interfering with his FMLA rights to be relieved of workplace duties and the accompanying stress while on medical leave.

122.    Defendant retaliated against Plaintiff for exercising his rights under the FMLA by terminating his employment only three weeks into his protected leave.

123.    Defendant further retaliated against Plaintiff by offering to re-hire him as a "new hire" without his tenure and in an Assistant Manager position far below his experience level.

124.    Defendant's reason for terminating Plaintiff was pretext for retaliation against

Plaintiff for his entitlement to and need for FMLA, and for taking approved time off pursuant to the FMLA.

125.    Defendant's actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights such that Plaintiff is also entitled to recover liquidated damages.

## COUNT IV
### Discrimination in Violation of the Americans with Disabilities Act
### 42 U.S.C § 12101 et seq.

126.    The allegations in the foregoing paragraphs are incorporated by reference herein.

127.    Plaintiff exhausted his administrative remedies by timely filing a charge with the Equal Employment Opportunity Commission ("EEOC") on or around May 30, 2019 (Charge No. 430-2019-02046).

128.    The EEOC issued a Dismissal and Notice of Rights on December 3, 2019. The same was received by Plaintiff's counsel on December 9, 2019. Therefore, this action is timely filed.

129.    Defendant regularly employed more than fifteen employees at all relevant times.

130.    Plaintiff was qualified for his position and could perform the essential functions of his job with or without an accommodation at all relevant times.

131.    Plaintiff qualified as an individual with a disability in that he was actually disabled and was perceived as such. Mr. Manning's health rapidly deteriorated throughout 2018 and he was eventually diagnosed with depression, anxiety, high blood pressure, insomnia, and physical exhaustion.

132.    Plaintiff's disability(ies) substantially limited one or more of his major life activities.

133. Plaintiff's disability(ies) were accompanied by extreme weight loss of approximately 60 pounds over a couple months, he was visibly distressed, and he experienced a panic attack while at work. These outward symptoms drew attention from the Defendant's leadership team, fellow employees, and Club members, and prompted inquiries from said individuals about his health.

134. Defendant violated the Americans with Disabilities Act ("ADA") by treating Plaintiff differently from his peers in the terms and conditions of his employment and ultimately terminating his employment.

135. Defendant terminated Plaintiff because of his real or perceived disability (i) shortly after it became visibly apparent Plaintiff's health was declining, and (ii) approximately three weeks after Plaintiff requested and began utilizing his right to a protected medical leave of absence.

136. Defendant violated the ADA by denying Plaintiff a medical leave of absence for a definite period of time as a reasonable accommodation.

137. Defendant's actions actually and proximately caused Plaintiff damages. As a proximate result of Defendant's wrongful conduct, Plaintiff has suffered lost wages, lost benefits, emotional distress, anxiety, humiliation, and damage to his reputation, and is entitled to recover compensatory damages.

138. Defendant's actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights such that Plaintiff is also entitled to recover punitive damages. Defendant's officers, directors, and managers participated in and condoned the malicious, willful, wanton, and reckless conduct alleged above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the Court:

1.     Enter a judgement against Defendant to pay Plaintiff compensatory damages in excess of the sum sufficient for subject matter jurisdiction to be properly vested in this Court, pursuant to 28 U.S.C. § 1332 *et seq.*;

2.     Award Plaintiff all wages, salary, employment benefits, and other compensation that he would have received but for the discrimination and interference, including pre-judgment interest;

3.     Award Plaintiff liquidated (double) damages equal to all wages and benefits that he would have received but for the interference, plus prejudgment interest;

4.     Award Plaintiff punitive damages pursuant to N.C.G.S. § 1D-1 *et seq.* and 42 U.S.C. § 12117(a);

5.     Award Plaintiff post-judgment interest;

6.     That Plaintiff be awarded his costs of maintaining this action, including reasonable attorneys' fees and all costs and expenses of filing this suit; and

7.     That Plaintiff be awarded any other or further relief as this Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby respectfully demands a trial by jury of the allegations contained in this Complaint.

This the 6th day of March, 2020.

/s/ Nicole Haynes
Nicole K. Haynes, Esq. (NC Bar No. 47793)
Joshua R. Van Kampen, Esq. (NC Bar No. 32168)
Van Kampen Law, P.C.
315 East Worthington Avenue
Charlotte, NC 28203
Phone: (704) 247-3245
Fax: (704) 749-2638
Email: nicole@vankampenlaw.com
Email: josh@vankampenlaw.com
*Attorneys for Plaintiff*

**State of Florida Acknowledgement Notary Certificate**

**STATE OF FLORIDA**
**COUNTY OF MANATEE**

On 3/5/20 before me, *Susan Dodd* a notary public, personally appeared by physical presence, *Thomas Mann* who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the attached [name of document] instrument and acknowledged to me that that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or entity upon behalf of which the person(s) acted executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State listed above that the foregoing paragraph is true and correct. WITNESS my hand and official seal.

Personally known            OR
Produced identification            Type of identification produced:

_Susan Dodd_
_____

*(Signature of notary public)*

**My commission expires:** 4.14.2023

> NOTARY PUBLIC
>
> SUSAN D. DODD
> Notary Public, State of Florida
> Commission# GG 306063
> My comm. expires Apr. 14, 2023

**Official Seal**

05-74-0433NSB  02-2020

# <u>Verification</u>

I, Thomas Manning, being duly sworn, deposes and says that I am the Plaintiff in this action, that I have read the Complaint and know the contents thereof, and the same is true to my knowledge, information and belief.

This the _5_ day of March, 2020.

_____
Thomas Manning
*Plaintiff*

State of _____ County of _____
The foregoing instrument was acknowledged before me this _____ day of _____, 20____, by _____, Notary Public.
My Commission Expires _____